Mr. Chief Justice Sharkey
delivered the opinion of the court.
This case originated in the court of chancery, on a bill filed by James H. Leverick, in his lifetime, to foreclose a mortgage *565 on certain real estate, in or near the city of Natchez, and the president and selectmen filed an answer and cross-bill, in which they claim to be exonerated from all liability.
It seems that there was a joint stock company at Natchez, known as the Natchez Railroad Company, though it was not incorporated. This company, in 1834, purchased of Lard and Mrs. Townshend certain real estate, for the joint benefit of the company, and took a conveyance in the name of Stephen Duncan, as president, and “his successors in office and assignees,” in trust for the use and benefit of the stockholders “ and their heirs,” in proportion to the number of shares owned by each.
In March, 1837, Duncan, as president, under a power of attorney from the stockholders, conveyed a portion of this same property to the president and selectmen of the city of Natchez, for $13,600, payable in three instalments, secured by bonds and mortgage. In Duncan’s deed reference is- made, for greater certainty, to the deed from Lard and Townshend, then of record, and he undertook to convey only such interest as he had acquired by the former conveyance. The bonds remained in possession of Duncan until the fall of 1838, when he delivered them to Strother, on being assured that he had purchased but all or nearly all of the stockholders, who were the owners of the bonds, Strother having exhibited 'his conveyances at the same time. This was after the first bond was due, and the city authorities gave Strother a new one in its stead, and thereby changed the time of payment.
- Strother, very soon after he received the bonds¡ took them to New Orleans, and on the 20th of November, 1838, pledged them with Leverick & Co., to secure them for- letters of credit which they gave him, to the amount of $20,000, on which he drew bills to about that amount, which they accepted and paid, and in this way Leverick & Co. claim to- be the holders of the bonds, and entitled to the benefit of the mortgage.
After this time Strother entered into negotiations for the purchase of the same property the city had purchased of Duncan, which negotiations seem to have been going on when Duncan *566 delivered the bonds, and a contract was finally entered into on the 3d of January, 1839. By this the city authorities agreed to convey the property to Strother, except such parcels, for which he was to be allowed compensation, which had been disposed of on leases, or appropriated as streets, “with the same appearance of title” that had been acquired from Duncan. But this conveyance was only to be made if Strother would deliver up to be cancelled the bonds which had been given for the property, which he agreed to do, at or before their maturity. This instrument was signed by Strother, and by Tooley, as president of the selectmen ; but the name of Strother was afterwards obliterated by drawing the pen over it. This is said to have been done by Strother, who obtained it from the clerk with whom it had been deposited, some time after the instrument was executed.
Leverick & Cp. had brought suit in the United States court, and recovered judgment on one of the bonds, and the defendants enjoined the judgment. On the others they had brought suits in the circuit court of Adams county, and were also proceeding to foreclose the mortgage. The foregoing statement contains the substance of what is given more in detail by the cross-bill and proofs. The chancellor decreed a foreclosure, from which an appeal was taken.
Various grounds are taken in argument for the appellants, some of which are entirely independent of the contract between Strother and the board of selectmen. First, it is insisted that the bonds were void, because Duncan acquired no title by the conveyance to him, as the deed was to him and his successors, which does not. convey a fee to an unincorporated company • and that having acquired none, he could of course pass none to the city.
The answer to this position seems to us to be most obvious, although it was a point much pressed. There is no such thing as a defect of title set up in the cross-bill. No eviction, no disturbance, no outstanding title alleged to exist. And if it be even true that the city did not acquire the fee, that is not, of itself, a reason why a court of chancery should interpose and *567 declare the bonds void. For anything that appears, they got all they contracted for. There is no allegation of fraud, misrepresentation or mistake, and the authorities referred to on this point, require that there, should be fraud or mistake. They cannot, therefore, apply where there is nothing of the kind. There is not even an allegation that the vendees were ignorant of the nature of the title. On the contrary, it is perfectly manifest that they were not. The conveyance to them refers expressly to the deed to Duncan, and professes to convey only the property or interest vested in Duncan by the conveyance from Lard and Townshend. It is true there is a general warranty, but the preceding part of the deed is at least sufficient to show that the vendees must have been informed of any defect of title. Besides, the conveyance to Duncan was in trust for the use of the stockholders and “ their heirs,” in proportion to the quantity of stock owned by each. Such a trust would undoubtedly be enforced. A deed to an unincorporated company, and their successors, might be void, and so a deed to the citizens of a town would be’void on the authorities cited; but this is on the ground of uncertainty; there must be a grantor and a grantee named, who is capable of taking. The naming of Stephen Duncan as trustee obviated the difficulty, as will be seen by the language of the court in the case of Jackson v. Corry, 8 John. 301. The ground, therefore, that the bonds were void must fail, and this disposes of the several positions predicated on the assumption that the bonds were void for a defect in the title.
Another position is, that the bonds were acquired from Duncan by fraud, but this position is not true in point of fact. Duncan states expressly that he delivered them on beibg satisfied that Strother had purchased out the interest of the stockholders, and had thereby acquired a right to the bonds; and on the faith of his right they were delivered, not to be cancelled or delivered up, but to be collected or used #as Strother’s property. And another conclusive proof that they were not so acquired is, that the city renewed the obligation first due, after Strother had obtained possession of them, without questioning his right.
*568 Nor is there any foundation for the argument that Strother, who was a cestui que trust, had disaffirmed -the contract made by Duncan, his trustee. He had affirmed it by various acts. The contract for the bonds was the first act of affirmance. If he had chosen to disaffirm he had nothing to do with the bonds given for the purchasemioney. Taking a renewal of one of them, was a most unqualified act of affirmance, and so was the contract to purchase the property, and the transfer of the bonds was another act equally conclusive. Admitting, then, that he had a right to disaffirm, he did not do so. On the contrary, every act in reference to the bonds and property, was an unqualified affirmance of Duncan’s sale.
The case must, therefore, turn exclusively on the equity, if there is any, arising out of the contract between Strother and the city. It is charged in the bill and established by proof, that this agreement was signed by both parties, and delivered to the clerk for safe keeping, and that Strother obtained possession of it afterwards, and erased his name. He could not, in this way, rescind or avoid the contract. This circumstance, therefore; avails nothing, and if the'strenglh of the stipulations will entitle the city to relief, it must be given.
It is true that Leverifck & Co. took the bonds subject to all the equities which existed between Strother and the city at the time of thef transfer, and even up to the time the city had notice of the transfer. Now, as Strother had agreed to purchase the property and deliver up the notes, and the city undertook, on his doing so, to convey, that contract is binding on Leverick & Co., unless the city made the contract with notice of the transfer. If this was done, then of course the equities of the city must be subservient to the equities of Leverick & Co. The whole controversy is, therefore, resolved into a mere question of notice, and is easily solved by the proof. The bonds were transferred on the 20th of November, 1838, and the contract between Strother and the city was entered into on the 3d of January, 1839. The first thing worthy of remark on this subject is, that the cross bill does not allege that the contract was made with Strother in ignorance of the transfer. The absence of such *569 an allegation would of itself go far to sustain a presumption that the city authorities had notice. On this state of pleading, the city could not be permitted to change its ground, and rely on want of notice. Pleadings are to be taken most strongly against the pleader ; and it is to be supposed that the best aspect of the case has been presented. But Dr. Tooley speaks positively on this subject, aud he was the president of the board, and as such signed the agreement. He says that when Strother was requested to deliver the notes, he stated that he had pledged them to a merchant in New Orleans, but had not sold them, and would get them back, and surrender them within the time. This information, as it appears from the proof, was given at the time the agreement was entered into. This was notice of transfer, and it was evident on that state of facts, that Strother relied on his ability to redeem the bonds, and the contractin'!; parties must have known that his ability to comply must have depended on his redeeming the bonds, and knowing this fact, the contract was made on the faith of Strother’s promises. The city could not have contracted on the understanding that he then had the bonds in his possession. The circumstance of making such a contract executory in its character, of itself conduces to prove that the city authorities were aware that the bonds had been transferred. As they had notice of the assignment or pledge, they must rely upon the only security they required, the promises of Strother, as contained in the agreement. They have no equity as against Leverick & Co.
But it is lastly insisted that the pledge was not made in accordance with the laws of Louisiana, and therefore Leverick & Co. did not acquire such a right as will enable them to enforce the claim in this state. The bonds were made in this state, and were here payable. They must therefore be construed, and payment enforced according to the laws of this state. The great doubt in cases of foreign assignments, has been, whether the assignment must not conform to the lex loci contractas. The point, however, seems to be settled by some authorities, that an assignment under a foreign law will pass *570 title. Story’s Conflict of Laws, 332, 333; Holmes v. Remsen, 4 J. C. R. 460. But others hold a contrary doctrine. Conflict of Laws, 474. Even an informal assignment is said to be sufficient in equity. We know of no instance in which an assignment has been questioned, if made according to the laws of the state in which the debtor resides, when the contract is payable there, and sought to be enforced there, when real estate is the subject of controversy. Leverick & Co. are seeking to enforce a mortgage of real estate, situated in this state, and if they have acquired a right to do so in conformity to the laws of this stat q they are entitled to their remedy. And we apprehend that whilst a mere assignment of the bonds, made according to the laws of Louisiana, would be binding, that an assignment made according to the laws of this state, would also be valid at law. In equity it surely would be. The pledge, or transfer to Leverick & Co., was made as collateral security; their title was absolute when they accepted the bills and paid them. They then held as bona fide assignees of the bonds and the mortgage, and are entitled to proceed upon either or both.
Decree affirmed.